### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

---

COASTAL JERSEY HOLDINGS, LLC,

               Plaintiff,

    v.

JAMES GIORDANO and DENNIS MIHALATOS

               Defendants.

1:22-cv-02024-NLH-EAP

**OPINION**

---

Appearances:

TREVOR J. COONEY
ALEXIS M. WAY
ARCHER & GREINER, PC
1025 LAUREL OAK ROAD
VOORHEES, N.J. 08043

JOSIAH A. CONTARINO
DHILLON LAW GROUP INC.
50 PARK PLACE, SUITE 1105
NEWARK, N.J. 07102

    *On behalf of Plaintiff*

MICHAEL J. MALINSKY
FITZGERALD MCGROARTY & LIPARI
401 NEW ROAD, SUITE 104
LINWOOD, N.J. 08221

TIMOTHY J. BLOH
LAUREN WRIGHT
FOX ROTHSCHILD, LLP
MIDTOWN BUILDING
1301 ATLANTIC AVENUE, SUITE 400
ATLANTIC CITY, N.J. 08401

    *On behalf of Defendants*

**HILLMAN**, District Judge

Pending before the Court are Plaintiff Coastal Jersey Holdings, LLC's ("Plaintiff") motion for summary judgment, (ECF 34), and Defendants Dennis Mihalatos and James Giordano's (collectively "Defendants") cross-motion for summary judgment, (ECF 38).  For the reasons expressed below, Plaintiff's motion will be granted and Defendants' motion will be denied.

**I. Background**

This dispute arises out of an unsuccessful real-estate transaction in which Plaintiff was to sell to Defendants a fifteen-unit hotel in Ventnor City, New Jersey (the "property").  On September 29, 2021, Defendants' attorney, Joseph L. Youngblood, Jr., submitted a letter of intent setting forth the basic terms of Defendants' purchase of the property for $1.25 million.  (ECF 34-6).  The parties subsequently entered into a purchase and sale agreement ("PSA") on October 28, 2021.  (ECF 34-7).

The PSA contained multiple sections now relevant to the parties' contentions.  First, Section 3(a) provided that Defendants were to deposit $125,000 (the "deposit") into a non-interest-bearing account with Surety Title.  (Id. at 4).  If the sale of the property moved forward, the deposit was to be credited toward the purchase price of $1.25 million; however, upon a default by Defendants, the deposit was to be paid to and

2

retained by Plaintiff.  (Id.).

Second, Section 4(d) referred to "Mortgage Contingency" and read:

> Buyer shall promptly apply for and use Buyer's best efforts to obtain a financing commitment, if deemed necessary, from a commercial lender and close as soon as possible after the Effective Date of this Agreement.  Buyer shall submit an application for financing to one or more commercial lenders within fourteen (14) days from the Effective Date of this Agreement, and diligently pursue such applications. Buyer shall have until the expiration of the Due Diligence Period (as defined below) to obtain a financing commitment for seventy-five percent 75% of the Purchase Price with minimum term of twenty (20) years or more, and Buyer shall proceed to consummate Closing under this Agreement.  If Buyer is unable to obtain a financing commitment for the acquisition prior to the expiration of the Due Diligence Period (as defined below) or any extension thereto, Buyer may terminate this Agreement.  At that time, the Deposit shall be refunded to Buyer.

(Id. at 6).

Third, Section 4(e) discussed the Due Diligence Period referenced in Section 4(d), defining it as the forty-five days following the effective date of the PSA, with Defendants able to invoke a single thirty-day extension if necessary.  (Id.). Further, if Defendants elected not to extend the Due Diligence Period, they possessed the right to terminate the PSA for any reason by written notice prior to expiration of the Due Diligence Period, at which point the deposit was to be returned to them minus any sums to which Plaintiff was entitled.  (Id.)

Fourth, Section 12 set the closing date at the thirtieth

3

day following the expiration of the Due Diligence Period or a date mutually agreed upon by the parties and stated that the closing date "shall be of the essence to this Agreement."[1]   (Id. at 15).   Fifth, Section 14 provided that, in the event of Defendants' default, "the Deposit shall be forthwith paid to and retained by Seller as liquidated damages and shall be Seller's sole remedy at law or in equity."   (Id. at 16).   Finally, Section 18(b) stated that the PSA represented "the entire Agreement" between the parties and superseded any prior agreement and that "[a]ny waiver, amendment, modification, consent or acquiescence with respect to any provision of this Agreement or with respect to any failure to perform in accordance therewith shall be set forth in writing and duly executed by or on behalf of the party to be bound thereby." (Id. at 18).

On December 10, 2021, Youngblood emailed Plaintiff's counsel, Edward J. Hovatter, seeking an extension of the Due Diligence Period to January 16, 2022.[2]   (ECF 34-8).   The parties thereafter executed an amendment to the PSA extending the Due

---

[1] Section 18(d) further expressed that "[t]ime is of the essence in the performance of and compliance with each of the provisions and conditions of this Agreement."   (ECF 34-7 at 19).

[2] The text of the letter sought an extension to January 16, 2021. (ECF 34-8).   The Court presumes that this was a typographical error and interprets the intent of the letter as seeking an extension to January 16, 2022.

Diligence Period to January 16, 2022 and setting the closing date at the thirtieth day following the conclusion of the extended Due Diligence Period.  (ECF 34-9).  The amendment did not otherwise change the terms and conditions of Sections 4 and 12 of the PSA and expressly stated that any further amendment, modification, or consent was to be set out in writing and signed by or on behalf of the party to be bound.  (Id.)

Hovatter wrote to Youngblood on January 18, 2022 stating that the extended Due Diligence Period had expired, the amendment to the PSA set a February 15, 2022 closing date, and Plaintiff sought the title commitment and confirmation that Defendants secured tax clearance.  (ECF 34-10).  The record does not reflect that Youngblood responded to Hovatter's January 18, 2022 letter in any formal way, but Youngblood did confirm with Surety Title that same day that the closing was set for February 15, 2022 and the matter was to be "expedited." (ECF 34-11.)

Hovatter again wrote to Youngblood on February 8, 2022 following a telephone conversation the previous day.  (ECF 34-12).  Hovatter's letter sought confirmation that prorations would be made as of February 15, 2022 and "given the fact that Closing may extend beyond March 1, 2022, the winterization of the property must be completed to avoid potential damage . . . should Closing extend beyond March 1, 2022.  Seller is asking that Buyer cover the cost of winterization, estimated to be

$7,500." (Id.). The letter further stated that these conditions were to be discussed in greater detail before further amendment to the PSA. (Id.)

Although neither side is particularly clear on this point, it seems obvious that in the time between the Hovatter's January 18, 2022 and February 8, 2022 letters, he and Youngblood had at least discussed moving the closing date from February 15, 2022 to March 1, 2022 and possibly later. Since the February 15, 2022 closing date had not yet arrived at the time Hovatter sent his February 8, 2022 letter, the reference to a closing date beyond March 1, 2022 otherwise makes no sense.[3]

In any event, Youngblood later testified that he did not recall informing Hovatter that Defendants were agreeable to the

---

[3] It also appears plain and uncontested that whatever Hovatter and Youngblood discussed with respect to extending the closing date was not agreed to by Matt Tucker, Plaintiff's general counsel, as Tucker's below-described February 17, 2022 email evidences Tucker's understanding that the closing date had not been extended further. (ECF 34-20). Defendants even argue that Hovatter and Tucker "were not communicating effectively" during the course of the attempted transaction as evidenced by Tucker's February 17, 2022 email. (ECF 38-1 at 18). In a separate February 17, 2022 email, however, Hovatter referred to an extension to March 1, 2022 as a "proposed change." (ECF 34-19). The Court is satisfied that any real or perceived ambiguity in the record as to the operative closing date does not represent a contested issue of material fact. As explained below, the Court finds that the PSA was not contingent on financing and, alternatively, Defendants were unwilling and unable to close on either date and had forfeited any claim to the deposit by failing to terminate the PSA prior to the conclusion of the extended Due Diligence Period.

6

stated conditions.  (Youngblood Dep. Tr. at 72:11-23).  Hovatter
testified that, while he recalled seeing a draft of a second
amendment to the PSA, he did not believe that it was ever
negotiated, finalized, or executed.  (Hovatter Dep. Tr. at 40:8-
13).  In a February 9, 2022 email to Hovatter, Youngblood
conveyed that Defendants agreed to prorations in exchange for a
March 1, 2022 closing date but stated that winterization of the
property should have been completed earlier and Defendants
should not have been responsible for the cost – evidencing a
lack of agreement on any further extension of the closing date.
(ECF 34-15).  The next day - February 10, 2022 - Youngblood
called Hovatter to request an even further extension of the
closing date to May 1, 2022.  (ECF 34-17).  At that point, the
last closing date agreed to in writing was only five days away.

February 15, 2022 came and went without a closing and there
is no record of any further discussion between the parties until
February 16, 2022 when Youngblood emailed Hovatter seeking
access to the property for an appraisal on the following day, to
which Hovatter agreed.  (ECF 34-19 at 2-3).  Youngblood then
sought confirmation that permission to appraise the property
meant that Plaintiff would agree to a May 1, 2022 closing date,
to which Hovatter responded:

> Please do not presume that Seller has agreed to the
> extension for Closing until May 1, 2022.  I had a
> series of telephone conference calls just to organize

access to the Property for today.  I spoke with
General Counsel, Operations Manager and the Property
Manager.  Seller[] is supposed to contact me directly
today for its position relative to the Closing Date,
proposed change to it of March 1 and the new, proposed
Closing Date of May 1, 2022.  I understand that Seller
is very upset since the extended Closing Date will
impair or adversely affect the 1031 Exchange.  Please
contact me to further discuss.

(Id. at 1-2).

On February 17, 2022, Tucker responded to the email thread
in which Youngblood sought property access for the appraisal.
(ECF 34-20).  Tucker advised Youngblood by email that Defendants
were in default for failing to close within thirty days of the
expiration of the extended Due Diligence Period and that the
deposit was to be paid to Plaintiff immediately.  (Id. at 1).
Plaintiff was unwilling to extend the closing date to May 1,
2022, according to Tucker, but was willing to consider a written
proposal for a closing on or before March 15, 2022 in exchange
for prorations as of February 16, 2022, immediate payment and
retention of the deposit, and an additional $125,000 deposit.
(Id.).

Youngblood emailed Hovatter on February 22, 2022 stating
that Defendants were prepared to close on March 15, 2022 and no
later than March 22, 2022.  (ECF 34-21).  Hovatter wrote to
Youngblood on February 23, 2022 seeking an update as to whether
Defendants had reached a decision regarding the terms set out in
Tucker's notice of default, (ECF 34-22), and under separate

8

cover on the same day mailed Youngblood a copy of Tucker's email as a notice of default, (ECF 34-23).

Within just a few days these efforts to salvage the sale would fail.  In a February 25, 2022 email, Youngblood informed Hovatter that Defendants would not move forward with the sale. (ECF 34-24).  Youngblood's email was some forty days after the expiration of the extended Due Diligence Period and ten days after the last closing date that had been reduced to a signed writing.

Hovatter mailed Youngblood a termination agreement on March 1, 2022, which directed the release of the deposit to Hovatter's trust account.  (ECF 34-25).  Defendants did not sign and return the termination agreement.  (Youngblood Dep. Tr. at 103:22 to 104:3).  Plaintiff later learned that Defendants never deposited $125,000 with Surety Title, (ECF 34-26), and on March 9, 2022, Hovatter emailed Youngblood and William P. Lopriore, Jr. advising that Plaintiff was prepared to file suit if Defendants did not surrender the deposit by March 12, 2022, (ECF 34-27). Hovatter sent a follow-up letter to Youngblood and Lopriore on March 16, 2022 confirming that he did not receive the deposit funds in the time allotted and that Plaintiff intended to file suit to recover the deposit and reasonable attorney's fees.

(ECF 38-6).[4]

Plaintiff initiated this action on April 7, 2022. (ECF 1). As later amended, Plaintiff asserts a single count – breach of contract – and seeks damages along with pre- and post-judgment interest and attorney's fees and costs. (ECF 15 at ¶¶ 36-41, p. 6-7).

In their answer to Plaintiff's initial complaint, Defendants asserted counterclaims of breach of contract and specific performance. (ECF 7 at cc. ¶¶ 8-16). On August 26, 2022, Plaintiff moved for judgment on the pleadings as to Defendants' counterclaims. (ECF 20). The parties subsequently stipulated to partial dismissal, dismissing with prejudice Count 2 of Defendants' counterclaim seeking specific performance and Count 1 to the extent that it sought performance by Plaintiff pursuant to the PSA. (ECF 22).

---

[4] Inexplicably, and in direct conflict with his real-time communications with Youngblood, Hovatter wrote in his March 16, 2022 letter that "[t]he Closing Date was . . . extended to March 1, 2022 . . . ." (ECF 38-6 at 1). As the Court has and will recognize throughout this opinion, this does not represent a disputed issue of material fact because even if the closing date had been extended – and the Court concludes that no reasonable jury could conclude that it did – the parties did not agree to a further extension of the Due Diligence Period. It was that date, not the closing date, that flipped the switch between Defendants being able to terminate the agreement and retain their deposit and the deposit being forfeited to Plaintiff in the event that the parties did not close. As further explained below, Defendants' attempt to conflate the closing date and conclusion of the extended Due Diligence Period – governed by different provisions of the PSA – is unavailing.

Plaintiff thereafter filed the pending motion for summary judgment. (ECF 34). Defendants filed an opposition and cross-motion, (ECF 38), to which Plaintiff replied, (ECF 39).

## II. Discussion

### A. Jurisdiction

The Court has jurisdiction over this matter as the parties are diverse in citizenship and the amount in controversy exceeds $75,000. See 28 U.S.C. § 1332(a).[5]

---

[5] The amended complaint asserts that Giordano is domiciled in New Jersey and Mihalatos is domiciled in New York. (ECF 15 at ¶¶ 3-4). The original complaint stated that Plaintiff "is a New Jersey limited liability company and resident of Maryland" and provided incomplete details as to its membership. (ECF 1 at ¶ 1). For the purposes of establishing diversity jurisdiction, "the citizenship of an LLC is determined by the citizenship of each of its members." Zambelli Fireworks Mfg. Co., Inc. v. Wood, 592 F.3d 412, 418 (3d Cir. 2010). On July 11, 2022, the Court entered an order to show cause directing Plaintiff to amend its complaint to assure the Court of its jurisdiction pursuant to 28 U.S.C. § 1332. (ECF 13). The amended complaint states that Plaintiff's sole member is TAN Resort Management, LLC, a Maryland limited liability company with a principal place of business in Millersville, Maryland and that the sole member of TAN Resort Management, LLC is BC Property Holdings, LLC, itself a Maryland limited liability company with its principal place of business in Glen Burnie, Maryland. (ECF 15 at ¶ 1). The only two members of BC Property Holdings, LLC are Bradley S. Callahan, an individual domiciled in Maryland, and Callahan Services, Inc., a Maryland corporation with its principal place of business located in Glen Burnie, Maryland. (Id.). The citizenship of a corporation for diversity purposes is the state of incorporation and state in which its principal place of business is located, while the citizenship of an individual is based on their state of domicile. Zambelli Fireworks Mfg. Co., Inc., 592 F.3d at 419. The Court is thus satisfied that it may exercise diversity jurisdiction over this action involving Defendants, citizens of New Jersey and New York, and Plaintiff, which - based on its membership - is a citizen of Maryland.

**B. Summary Judgment**

The Federal Rules of Civil Procedure dictate that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine when "the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party'" and a fact is "'material' if it 'might affect the outcome of the suit under the governing law.'" Razak v. Uber Techs., Inc., 951 F.3d 137, 144 (3d Cir. 2020) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Facts and evidence are to be viewed in the light most favorable to the nonmovant. Id.

Our Local Civil Rules require that motions for summary judgment be accompanied by a statement of material facts not in dispute – separate from any brief – setting forth material facts with citations to relevant supporting documents. L. Civ. R. 56.1(a). The Local Civil Rules further require the opponent of a summary judgment motion to file a responsive statement of material facts responding to each paragraph of the movant's statement, asserting agreement or disagreement, "and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion." Id. Therefore, "any statement, or portion thereof, that is not clearly denied – in substance, not merely with the

12

label 'disputed' – and with a proper citation to the record in a responsive Rule 56.1 statement is deemed admitted." <u>Boyd v. City of Jersey City</u>, No. 15-0026, 2018 WL 2958468, at *1 n.2 (D.N.J. June 13, 2018) (quoting <u>Juster Acquisition Co. LLC v. N. Hudson Sewerage Auth.</u>, No. 12-3427, 2014 WL 268652, at *1 n.1 (D.N.J. Jan. 23, 2014)); <u>see also</u> Fed. R. Civ. P. 56(e) (providing that, in the event that a party fails to properly address an assertion of fact, a court may provide an opportunity to properly address the fact, consider the fact undisputed, grant summary judgment, or issue any other appropriate order); <u>Colony Ins. Co. v. Kwasnik, Kanowitz & Assocs., P.C.</u>, No. 1:12-cv-00722, 2014 WL 2920810, at *2 (D.N.J. June 27, 2014) ("[T]o withstand a properly supported motion for summary judgment, the nonmoving party cannot rely upon mere allegations, general denials, or vague statements to establish a genuine issue of material fact." (citing <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001))).

**III. Analysis**

**A. Defendants' Statements of Material Facts**

As a preliminary matter, the Court addresses Plaintiff's argument, raised in its reply brief, that Defendants' cross-motion is procedurally deficient under Local Civil Rule 56.1 because it was not accompanied by a separate statement of material facts and that their response to Plaintiff's statement

13

of material facts similarly violates Local Civil Rule 56.1 because it contains unsupported denials.  (ECF 39 at 1 n.1).

The Court acknowledges that Defendants' statement of material facts in support of their cross-motion is improperly included within their brief, (ECF 38-1 at 3-10), rather than in "a separate document (not part of a brief)," L. Civ. R. 56.1(a). Though Plaintiff is correct that the statement is procedurally deficient as a result, the Court does not find that this error warrants – as Plaintiff urges – dismissal and the Court has nonetheless accepted the statement and considered it in the drafting of this opinion.  See Days Inn Worldwide, Inc. v. B.K.Y.K-II, Inc., No. 16-452, 2018 WL 5995489, at *1 n.1 (D.N.J. Nov. 14, 2018) (accepting the defendants' statement and counterstatement of material facts despite their failing to separate the statements from their brief).

Defendants' general, unsupported denials stating merely "Denied" or "Denied as stated" while failing to provide any supporting detail, let alone citation to supporting documents, is more concerning to the Court and cannot be simply overlooked without violating the letter and spirit of Local Civil Rule 56.1.  (ECF 38-2 at ¶¶ 22-23, 26-29, 32, 34-36, 38, 43, 45). These denials are facially insufficient and do not begin to meet Defendants' burden under both the Federal Rules of Civil Procedure and Local Civil Rules.  See Fed. R. Civ. P. 56(c)

14

(requiring that a party asserting that a fact is or is not
genuinely disputed support their assertion by citing to
particular portions of the record or showing that the materials
cited do not establish the absence or presence of a genuine
dispute); L. Civ. R. 56.1(a) ("The opponent of summary judgment
shall furnish, with its opposition papers, a responsive
statement of material facts, addressing each paragraph of the
movant's statement, indicating agreement or disagreement and, if
not agreed, stating each material fact in dispute and citing to
the affidavits and other documents submitted in connection with
the motion . . . .").

The purpose and utility of Local Civil Rule 56.1 is
manifest and essential to the Court's proper application of Rule
56.  This is especially so in the context of dueling summary
judgment motions.  At first blush, this case might seem to be a
straightforward contractual dispute.  But under scrutiny the
circumstances are nuanced and at times the facts, even after
full discovery, may seem ambiguous or opaque or, superficially
at least, in conflict.  This is not unusual or unexpected.  Gray
is a much more common tint in human discourse than black or
white.

It is the Court's task in this situation, and every case in
this procedural posture, to identify the elements of the claims
or defenses asserted, to view the record through the lens of

15

those elements to determine the facts that are truly material and not tangential, and to assess whether the evidence proffered by either side joins a genuine dispute requiring trial by jury, lest the Court veer from its designated lane to adjudicate only the law.  Generic denials, like those asserted here, while appropriate in a responsive pleading, and perhaps even some replies to the various forms of discovery demands, are unhelpful at best and disingenuous at worst in the context of summary judgment.  Each side in the dispute, and the Court, have the right to expect that at this juncture of the case the time has come to separate the wheat (those things material and in dispute) from the chaff (those things immaterial or undisputed).  Defendants' blanket and unsupported denials frustrate that process.

Because Defendants have failed to meet their burden under our Local Civil Rules, the Court finds it appropriate to deem each unsupported denial in Defendants' opposing statement of facts as admitted to the extent that Plaintiff has met its initial obligation of appropriately supporting its assertions with citations to the record.  See Boyd, 2018 WL 2958468, at *1 n.2; see also Fed. R. Civ. P. 56(e)(2) (providing that a court may consider a fact undisputed upon a party's failure to adequately respond to an opponent's assertion of fact as required by Federal Rule of Civil Procedure 56(c)).  These

admissions will be referenced in the body of the opinion below to the extent that they are relevant to the Court's analysis.

### B. Breach of Contract

Under New Jersey law,[6] a plaintiff may prevail in their breach-of-contract claim if they prove that (1) the parties entered into a contract, (2) the plaintiff "did what the contract required them to do," (3) the defendant "did not do what the contract required them to do," and (4) the defendant's breach caused a loss for the plaintiff. Goldfarb v. Solimine, 245 A.3d 570, 577 (N.J. 2021) (quoting Globe Motor Co. v. Igdalev, 139 A.3d 57, 64 (N.J. 2016)). "Divining the intent of a contract is ordinarily a question of law, making '[c]ases involving contract interpretations . . . particularly suited to disposition by summary judgment.'" Labega v. Joshi, 270 A.3d 378, 386 (N.J. Super. Ct. App. Div. 2022) (alteration and omission in original) (citation omitted) (quoting CSFB 2001-CP-4

---

[6] The PSA expressly stated that it "shall be governed by and construed in accordance with the laws of the State of New Jersey." (ECF 34-7 at 20). As the contract concerned real property located in New Jersey, the Court sees no basis to disturb the parties' agreement on choice of law. See Curtiss-Wright Corp. v. Rodney Hunt Co., Inc., 1 F. Supp. 3d 277, 284 (D.N.J. Feb. 18, 2014) ("Under New Jersey law, a contractual choice of law provision will be upheld unless doing so would violate its public policy." (citing Instructional Sys., Inc. v. Comput. Curriculum Corp., 614 A.2d 124 (N.J. 1992)); see also Restatement (Second) of Conflict of Laws § 188(2)(d)(1971) (counting "the location of the subject matter of the contract" as among the relevant contacts to be considered in the absence of an effective choice of law by the parties).

Princeton Park Corp. Ctr., LLC v. SB Rental I, LLC, 980 A.2d 1,
4 (N.J. Super. Ct. App. Div. 2009)) (discussing summary judgment
pursuant to the New Jersey Rules of Court).

Defendants rely heavily on the mortgage contingency clause
and contend that the PSA permitted them to terminate the
agreement if they were unable to secure financing, Plaintiff was
aware of Defendants' financing efforts as evidenced by multiple
extensions to the closing date, after unsuccessful attempts to
obtain financing via multiple avenues they promptly terminated
the PSA, and under Davis v. Strazza, 882 A.2d 980 (N.J. Super.
Ct. App. Div. 2005), they were able to terminate the PSA after
the expiration of the extended Due Diligence Period.  (ECF 38-1
at 13-16).  The mortgage contingency clause provided that
Defendants could terminate the PSA prior to the conclusion of
the Due Diligence Period and "any extension thereto" and thus
Plaintiff's emphasis on the February 15, 2022 closing date is a
"red herring" that is also inapplicable as the closing date was
extended to March 1, 2022.  (Id. at 17-18).  Plaintiff itself
breached the PSA when it issued the default notice prior to the
allegedly operative March 1, 2022 closing date, according to
Defendants.  (Id. at 18-19).

Plaintiff counters that the PSA was not contingent on
financing but rather merely provided Defendants with the right
to apply for financing and at no time did Defendants advise

18

Plaintiff that they needed a mortgage.  (ECF 39 at 3-5).  The
fact that Section 4(d) was titled "Mortgage Contingency" – a
fact relied upon by Defendants – is unpersuasive, according to
Plaintiff, as under the PSA "Section and Paragraph headings . .
. [we]re solely for the convenience of reference and shall not
govern the interpretation of any of the provisions of this
Agreement."  (Id. at 5 (quoting ECF 34-7 at 20)).  Plaintiff
asserts that even if Section 4(d) could be interpreted as making
the agreement contingent on financing, in order to retain the
deposit Defendants were required to terminate the PSA at the
conclusion of the extended Due Diligence Period on January 16,
2022 and since they made no attempt to terminate until February
25, 2022, ten days after the operative closing date, they
forfeited the deposit as liquidated damages.  (Id. at 9-10; ECF
34-2 at 10 n.3).  Defendants have confused Plaintiff's prior
willingness to further extend the closing date with an actual
amendment to the PSA, according to Plaintiff, and no such
amendment extending closing beyond February 15, 2022 was
executed after Youngblood declined Hovatter's request to pay for
winterization of the property.  (ECF 34-2 at 9-11, 16; ECF 39 at
10-14).

     At the outset, the Court finds that no matter the general
legal principle for which Davis stands, it is readily

distinguishable from the instant matter.[7]  Most significantly,
the sale contract in Davis contained a clear condition expressly
stating that "[t]his agreement is contingent upon the purchaser
obtaining a conventional mortgage at a prevailing rate of
interest for 30 years with monthly payments based upon a 30 year
payment schedule."  882 A.2d at 981 (alteration in original).
Here, Section 4(d) of the PSA set forth the terms by which
Defendants were to apply for and obtain financing "if deemed
necessary."  (ECF 34-7 at 6).

　　"A mortgage contingency clause informs the sellers in clear
and unmistakable language that the buyers do not possess
sufficient funds to consummate the purchase without a loan."
Farrell v. Janik, 542 A.2d 59, 61 (N.J. Super. Ct. Law Div.

---

[7] In addition to the substantive factual differences between this
case, Davis, and the Appellate Division's decision in Malus v.
Hager, 712 A.2d 238 (N.J. Super. Ct. App. Div. 1998), which
Davis distinguished, the Court further notes that Davis and
Malus discuss residential home purchases.  There are undoubtedly
inherent differences in sophistication and resources between an
often lay homebuyer and an experienced and represented
commercial real estate professional.  Though Davis and Malus
will be referenced in this opinion, to the extent that either
opinion is persuasive to – though not binding on – the Court,
the Court finds that these disparities in sophistication and
resources render both opinions all the less applicable and
persuasive.  See Polizzi Meats, Inc. v. Aetna Life & Cas. Co.,
931 F. Supp. 328, 340 (D.N.J. June 19, 1996) ("This court is
guided, but not bound, by the rulings of the lower New Jersey
appellate courts, which may provide 'indicia of how the state's
highest court might decide' an issue." (quoting Pa. Glass Sand
Corp. v. Caterpillar Tractor Co., 652 F.2d 1165, 1167 (3d Cir.
1981))).

1988).  The Court holds that, unlike the contract language in
Davis, the plain language of Section 4(d) did not provide clear
and unmistakable indication that Defendants required financing
and Defendants have admitted by way of their inadequate denial
that they did not otherwise convey to Plaintiff their efforts to
securing financing.  (ECF 34-2 at ¶ 23; ECF 38-2 at ¶ 23).  The
fact that Section 4(d) was titled "Mortgage Contingency" has no
influence on the Court's decision because the express terms of
the contract stated that section and paragraph headings "shall
not govern the interpretation of any of the provisions of th[e]
Agreement," (ECF 34-7 at 20), and the Court further notes that
Youngblood's February 25, 2022 termination email did not
reference Section 4(d) or financing, (ECF 34-24).

     Even if the Court was to hold that the PSA was contingent
on Defendants obtaining financing, and it does not so hold here,
it further agrees with Plaintiff that the time during which they
were to secure financing or terminate the agreement was clearly
the Due Diligence Period.  Section 4(d) stated "[i]f Buyer is
unable to obtain a financing commitment for the acquisition
prior to the expiration of the Due Diligence Period . . . or any
extension thereto, Buyer may terminate this Agreement.  At this
that time, the Deposit shall be refunded to Buyer."  (ECF 34-7
at 6).  The Court finds no support for Defendants' position that
"the time [to] obtain[] financing or terminat[e] the Agreement

for the inability to obtain financing was not limited to extensions of the" Due Diligence Period.  (ECF 38-1 at 17).  The clear terms of Section 4(d) tied "any extension thereto" to expiration of the Due Diligence Period, (ECF 34-7 at 6), which was extended to January 16, 2022 by way of the parties' executed amendment, (ECF 34-9).  When Defendants failed to secure financing as of January 16, 2022, their options – even giving Defendants the benefit of an effective mortgage contingency clause – were to terminate the PSA by that date or proceed to closing.  Defendants' failure to do either entitles Plaintiff to the deposit as the agreed-upon liquidated damages.

For the sake of completeness, the Court further concludes that – even if it were to hold that the PSA was contingent on financing and Davis permitted Defendants to terminate after the conclusion of the extended Due Diligence Period – the instant matter is further distinguishable from Davis as the buyers there sought to terminate three days prior to the scheduled closing date, see 882 A.2d at 982, while termination here was sought ten days after the operative closing date, (ECF 34-24).

Defendants maintain that the closing date was extended to March 1, 2022.  (ECF 38-1 at 14, 17-18).  The PSA and December 2021 amendment both required any amendment, modification, or consent to be made in writing and executed by or on behalf of the party to be bound.  (ECF 34-7 at 18; ECF 34-9).  The parties

entered into such an amendment extending the Due Diligence Period to January 16, 2022 and scheduling the closing for the thirtieth day thereafter.  (ECF 34-9).  The record does not contain any signed amendment extending the closing date beyond February 15, 2022.  Contractual provisions requiring written modification may nonetheless be expressly or impliedly waived by the parties' clear conduct or agreement as demonstrated by clear and convincing evidence, see Vincent Pools, Inc. v. APS Contractors, Inc., Nos. A-2670-13T & A-2688-13T3, 2015 WL 10489978, at *8 (N.J. Super. Ct. App. Div. Mar. 18, 2016) (citing Home Owners Const. Co. v. Borough of Glen Rock, 169 A.2d 129 (N.J. 1961) and Lewis v. Travelers Ins. Co., 239 A.2d 4 (N.J. 1968)), and agreements to modify an existing contract generally require new or additional consideration from both parties, see J&M Interiors, Inc. v. Centerton Square Owners, LLC, Nos. A-2536-19 & A-2882-19, 2021 WL 1976648, at *6 (N.J. Super. Ct. App. Div. May 18, 2021) (citing Cnty. of Morris v. Fauver, 707 A.2d 958, 967 (N.J. 1998)).  The Court holds that no reasonable jury could conclude that the writing requirement was expressly or impliedly waived or that the parties agreed to an extended closing date beyond February 15, 2022.

Defendants' contentions rest on Hovatter's March 16, 2022 letter recapitulating the attempted transaction and stating that the closing date had been extended to March 1, 2022, (ECF 38-6),

and Hovatter's deposition testimony in which he stated that permitting appraisal of the property impliedly extended the closing date, (Hovatter Dep. Tr. 32:3-23).  These portions of the record, while of some evidentiary value, are wholly incompatible with the parties' clear exchanges at the time of the alleged extension.  The Court's task is to determine the understanding of the parties at the time of the agreement, not after the fact and with the benefit of hindsight.  See Laplace v. Laplace, No. 03-4291, 2006 WL 83110, at *5 (D.N.J. Jan. 12, 2006), aff'd, Laplace v. Estate of Laplace ex rel. Laplace, 220 F. App'x 69 (3d Cir. 2007).  The parties' real-time discussions not only fail to demonstrate a waiver of the signed-writing requirement and an extension of the closing date, but – to the contrary – show a clear failure to reach such an agreement.

Hovatter wrote Youngblood on January 18, 2022 to note that the extended Due Diligence Period had expired, request the title commitment, and confirm whether Defendants secured tax clearance from the Bulk Sale Unit.  (ECF 34-10).  The record does not provide evidence of further discussions until February 8, 2022 when Hovatter wrote Youngblood in reference to an earlier telephone conversation and sought prorations and for Defendants to cover the cost of winterization as closing "may" have extended beyond March 1, 2022.  (ECF 34-12).  Defendants have admitted by way of their insufficient denial that Youngblood

understood Hovatter's letter to be seeking prorations and
winterization costs as consideration for an extended closing
date.  (ECF 34-1 ¶ 32; ECF 38-2 ¶ 32).  Youngblood responded on
February 9, 2022 that Defendants were agreeable to prorations,
but not the cost of winterization, "in return for an extension
of the closing date to March 1, 2022," (ECF 34-15), providing
further support that the parties had not agreed to an extension
as of February 9, 2022.

The February 15, 2022 closing date, which was of the
essence of the PSA, (ECF 34-7 at 15), came and went and
Youngblood sought and received permission to access the property
for an appraisal on February 16, 2022, (ECF 34-19).  Youngblood
stated at the time that Defendants wanted to confirm that
Plaintiff was agreeable to an extension before scheduling an
appraisal, (id. at 3), and Defendants now cite the permission
granted as evidence of an extended closing date, (ECF 38-1 at
18).  Defendants' position completely ignores the fact that
Youngblood expressly asked Hovatter "I assume this means your
client will agree to the closing extension to 5/1/22," to which
Hovatter's direct response was to "not presume that Seller has
agreed to the extension for Closing until May 1, 2022" and that

> Seller[] is supposed to contact me directly today for
> its position relative to the Closing Date, proposed
> change to it of March 1 and the new, proposed Closing
> Date of May 1, 2022.  I understand that Seller is very
> upset since the extended Closing Date will impair or

adversely affect the 1031 Exchange.  Please contact me
to further discuss.

(ECF 34-19 (emphasis added)).

The record therefore clearly demonstrates that the parties'
understanding as of Hovatter's February 17, 2022 response was
that both the March 1, 2022 and May 1, 2022 closing dates were
still at the proposal stage.  (Id.).  The parties were free at
that point to ignore Defendants' default and continue to work
toward an agreement, but Tucker was equally justified in
declaring that Defendants were in default for failure to close
on the operative closing date.  (ECF 34-20).

Defendants were aware that any extension to the closing
date was to be reduced to a signed writing based on both the
plain terms of the PSA, (ECF 34-7 at 18), and the fact that the
parties had previously executed an appropriate amendment
extending the original Due Diligence Period and closing date,
(ECF 34-9).  While the writing requirement may have been
expressly or impliedly waived, see Vincent Pools, Inc., 2015 WL
10489978, at *8, here no rational jury could find by clear and
convincing evidence that the parties waived the contractual
requirement that modifications be in writing and there is
absolutely no evidence that Defendants paid any consideration
for an oral extension.  What the parties exchanged was simply a
proposal – nothing more than an unconsummated discussion of a

potential extension.

Thus, even assuming that the PSA was contingent on financing and did not require termination during the extended Due Diligence Period, Defendants terminated ten days after the operative closing date of February 15, 2022, (ECF 34-24), and the Court declines to interpret the PSA as representing the parties' intent to place Plaintiff "in an intolerable state of limbo until the closing [wa]s finally consummated," see Malus, 712 A.2d at 240. Defendants were in default when they failed to close on February 15, 2022 and Plaintiff was thus entitled to the deposit as the agreed-upon liquidated damages. (ECF 34-7 at 15-16); see also Carteret Holdings Urb. Renewal, LLC v. Carteret Town Homes, LLC, A-2490-10T1, 2013 WL 949480, at *1 n.1 (N.J. Super. Ct. App. Div. Mar. 13, 2013) ("In a real estate contract, a 'time of the essence' clause is a set date requirement that is 'so important that if the requirement is not met, the promisor will be held to have breached the contract and a rescission by the promisee will be justified.'" (quoting Black's Law Dictionary 1196 (9th Ed. 2009))). "Confusion and uncertainty can only result from extending, as a matter of law, the mortgage contingency clause to the date of closing," Malus, 712 A.2d at 240, let alone beyond it.

Finally, the Court concludes that even if the parties agreed to waive the signed-writing requirement and extend the

27

closing date to March 1, 2022 – and it expressly does not so find – Plaintiff was free to interpret Defendants' February 25, 2022 termination as an anticipatory breach expressing Defendants' intent to not close.

"An anticipatory breach is 'a definite and unconditional declaration by a party to an executory contract – through word or conduct – that he will not or cannot render the agreed upon performance.'" Florham Vill., LLC v. N.J. CVS Pharmacy, LLC, No. 2:13-3160, 2014 WL 2611834, at *3 (D.N.J. June 11, 2014) (quoting Ross Sys. v. Linden Dari Delight, 173 A.2d 258, 264 (N.J. 1961)). "If the breach is material, the non-breaching party may treat the contract as terminated and commence suit forthwith." Mill Creek Mall, LLC v. Fabco Shoes Mill Creek, LLC, No. A-3580-05T2, 2007 WL 4481416, at *7 (N.J. Super. Ct. App. Div. Dec. 26, 2007). The February 25, 2022 email clearly indicated Defendants' intent not to close and there is no evidence in the record that Defendants were any more prepared to close on March 1, 2022 than they were on February 15, 2022.[8] To

---

[8] The Court notes that at no point after Tucker's notice of default on February 17, 2022 did Defendants reiterate a willingness, desire, or ability to close on March 1, 2022. The closest they come was Youngblood's email to Hovatter on February 22, 2022 stating that Defendants were prepared to close on March 15, 2022 and no later than March 22, 2022. (ECF 34-21). Thus, the undisputed facts show that the earliest Defendants could close and not be in default was March 15, 2002, two weeks after the date they contend was the new agreed-upon closing date. By any measure – even their own – Defendants had declared their

the contrary, the record indicates that Defendants were unable
to obtain financing any earlier than May 1, 2022 and were
unwilling to proceed with an "all-cash" deal.

In sum, the Court holds, first, that the PSA was not
contingent on financing, Section 4(d) referred only to the Due
Diligence Period and extended Due Diligence Period, and
Defendants forfeited their right to return of the deposit –
retaining only the right to apply those funds at closing to the
sale price – when they failed to terminate the agreement by
January 16, 2022.  Second, by failing to put into place the
requirements for a February 15, 2022 closing date and failing
the close on that date, Defendants breached the PSA entitling
Plaintiff to the deposit as liquidated damages.  Third, and
alternatively, even if a rational jury could find by clear and
convincing evidence that the parties had waived the right to a
written extension of the closing date and extended it to March
1, 2022, Defendants' notice of termination and inability to
close on March 1, 2022 represented an anticipatory breach.

Because the Court holds that Defendants were in default and
Plaintiff is entitled to summary judgment, it similarly finds
that Plaintiff was not, as Defendants allege, in breach of the
PSA when Tucker issued the default notice on February 17, 2022.

---

inability to perform under the PSA.

(ECF 34-20; ECF 38-1 at 18-19).  The Court will therefore deny Defendants' cross-motion.

The Court's decision is limited to whether summary judgment on the pending motions is warranted.  In addition to the deposit of $125,000, Plaintiff seeks interest.  (ECF 34-2 at 12; ECF 34-33).  Plaintiff has not, however, supported its entitlement to such additional sums or provided related calculations.  The Court will therefore enter this opinion and corresponding order granting its motion for summary judgment and provide Plaintiff thirty days to apply for any additional sums to which it believes it is entitled.

## IV. Conclusion

This Court sits as both a court of law and equity.  While it is said that equity abhors a forfeiture, that is the unfortunate but correct result on the uncontested facts of this matter.  In this proposed commercial sale, the sophisticated parties were represented by counsel.  Their agreement was clear. Whether or not the closing date was extended from February 15, 2022 to March 1, 2022 matters not, as Defendants could only retain their deposit if they terminated the agreement before the expiration of the extended Due Diligence Period under the plain terms of the PSA.  They failed to do so and also failed to proceed to closing even on the date they contend was set for closing, choosing instead to terminate the agreement just days

before the closing date and without contractual justification.

Thus in breach, Defendants' deposit reverts to the Plaintiff as liquidated damages as contemplated by the parties in the PSA.  Plaintiff's motion for summary judgment (ECF 34), will therefore be granted and Defendants' cross-motion for summary judgment, (ECF 38), will be denied.

An order consistent with this opinion will be entered.


Date: November 14, 2023          s/ Noel L. Hillman
At Camden, New Jersey            Noel L. Hillman, U.S.D.J.